IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| PAMELA L. MCKISSICK, | ) | |
| an individual, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 04-CV-262-JHP |
| | ) | |
| HENRY C. YUEN, an individual; | ) | |
| and ELSIE M. LEUNG, an individual, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER AND OPINION

Before the Court are Plaintiff Pamela L. McKissick's Motion for Summary Judgment
(Docket No. 277) and Defendant Henry C. Yuen and Defendant Elsie M. Leung's Motion for
Summary Judgment (Docket No. 266). For the reasons set forth below, Defendants' motion is
GRANTED, and Plaintiff's motion is DENIED.

## BACKGROUND

### A.    Factual Background[1]

On July 12, 2000, TV Guide, Inc. ("TV Guide") merged with Gemstar International Group
Limited. The surviving and successor entity was and is known as Gemstar-TV Guide International
("Gemstar"). Prior to the merger, Plaintiff Pamela L. McKissick ("McKissick") was President and
Chief Operating Officer of the TV Guide Channel, a business unit of TV Guide.

---

[1]The following facts are either undisputed—i.e., not specifically controverted by the non-moving party in
accordance with Local Civil Rule 56.1(c)—or are described in the light most favorable to McKissick. Additionally,
the Court has omitted many of the parties' submitted facts as they are immaterial to the issues before the Court.
Additionally, many of the parties' submitted "statements of fact" are not facts at all, but rather legal conclusions or
commentary on the implication of certain facts. The Court has similarly omitted these non-factual statements.

1

Through her employment with TV Guide, McKissick received options to purchase shares of TV Guide common stock. In late 1999, and prior to the merger, McKissick determined that her stock options would likely afford her the ability to build a horse ranch outside of Tulsa, something she had been considering since the early part of that year.

In January and then March of 2000, as the merger talks were ongoing, Gemstar Internationl Group Limited executives Defendant Henry C. Yuen ("Yuen") and Defendant Elsie M. Leung ("Leung") met with McKissick and other TV Guide executives to encourage McKissick and the other executives to stay with the merged company, hold on to their stock options, and refrain from selling any shares of stock with the company.

After the merger was finalized on July 12, 2000, McKissick became President and COO of the TV Guide Television Group and TV Guide Networks, which, as a result of the merger, were now business units of Gemstar.[2] Yuen became Gemstar's Chief Executive Officer while Leung became Gemstar's Chief Financial Officer. Both Yuen and Leung served on Gemstar's Board of Directors.

As part of the merger, TV Guide shareholders received .6573 shares of Gemstar stock for each share of TV Guide stock. Options to buy TV Guide stock were similarly converted into options to buy Gemstar stock. Thus, McKissick's options to buy TV Guide stock were converted into options to buy Gemstar stock.

Shortly after the merger, McKissick bought two Icelandic horses for delivery in October 2000. McKissick was also searching for land to purchase for her horse ranch.

Then, in January 2002, McKissick met with Yuen and Leung regarding their attempts to persuade McKissick to move to California, work next to Yuen in Gemstar's corporate offices, and

---

[2]Although McKissick was employed by TV Guide Television Group and TV Guide Networks, for clarity's sake the Court will refer to her employer as "Gemstar", as it was the parent company of those two business units.

build her horse ranch in La Cañada, California. McKissick explained that she was in the process of buying land for a horse ranch in Tulsa County, Oklahoma, and that she could not afford similar land in California. Yuen later assured McKissick that she did not need to move to California, that she was a valued executive, that she could perform her duties for the company from Tulsa, Oklahoma, and that being in Tulsa would not negatively impact her career.

In April of 2002, Gemstar filed a Form 10-K disclosing that it had reported and recorded over $113 million in revenues from a company called Scientific Atlanta pursuant to an expired license agreement. In response to that announcement, McKissick noted that the price of Gemstar stock fell $9, which was a substantial percentage of the share price, and negatively affected the value of the stock options she had been hoping to use to purchase a horse ranch.

In May 2002, McKissick asked Jeff Shell—who had been hired by Gemstar earlier in the year—about rumors she had heard that Gemstar's Tulsa operation was to be shut down in less than 24 months. In an email to Shell, McKissick stated: "I need to have you tell me 'straight' what the corporate plans are, so I can formulate mine." In response, Shell told McKissick that "I have no plans to 'shut down' Tulsa. If I ever consider it, you'll hear it from me and not through the grapevine."

When McKissick expressed similar concerns on other occasions, Shell made statements similar to those he made in May, and at one point told McKissick to "stop being paranoid." Shell told McKissick that her job was capable of being performed anywhere, and that he had managed people all over the country and did not care "where people sit."

In June 2002, McKissick made an offer on a 40 acre tract of land she intended to use as a horse ranch. In August 2002, McKissick closed on that purchase. Six months later, McKissick

3

bought a second 40 acres for her ranch.

On August 14, 2002, McKissick learned that Yuen and Leung were, in her words, "out" of Gemstar. After that date, McKissick had no further conversations relating to her employment or to the operation of the Tulsa office with either Yuen or Leung.[3]

On November 7, 2002, Yuen entered in a Termination Agreement as a result of which he stepped down as Gemstar's CEO; Yuen was replaced by Jeff Shell. On that same date, Yuen entered into a new, separate Employment Agreement with Gemstar. After November 7, 2002, Yuen had no management responsibility at Gemstar and was not involved in employment decisions at Gemstar.

On November 7, 2002 Leung entered into a Termination Agreement as a result of which she stepped down as CFO of Gemstar. On that date, Leung entered into a new, separate Employment

---

[3]There is a dispute over whether McKissick had *any* conversations with Yuen after August 14, 2002. However, it appears undisputed that she had no conversations with Yuen regarding her employment or the operations of the Tulsa office after that date:

> Q.   By the way, at this point, October 2002, you made the entry on August 14th that Henry Yuen and Elsie were out of the company.
>
> A.   Uh-huh.
>
> Q.   Did you have further conversations after that August date with either Henry or Elsie about the operations of the Tulsa office?
>
> A.   No.
>
> Q.   Did they play any role from August forward in your decisions relating to your employment status?
>
> A.   I don't know that, because I don't know what conversations Jeff Shell may have been having with them, or if anybody was talking to them. I assume not.
>
> Q.   And you didn't have any conversations with either of them?
>
> A.   I didn't.

(Docket No. 267-3, at 12, at 109:1-17). Therefore, for the purposes of this motion the Court simply takes as undisputed the assertion that "After [August 14, 2002], McKissick had no further conversations relating to her employment or the operations of the Tulsa office with either Yuen or Leung."

Agreement with Gemstar. After November 7, 2002, Leung had no management responsibility at Gemstar, and was not involved in employment decisions at the company.

In about December 2002, McKissick—who had no employment contract—attempted to negotiate a new compensation package for herself at Gemstar. McKissick proposed a base salary of $500,000, a guaranteed bonus of at least 50 percent of her salary, a retroactive bonus of $474,020 and a severance guarantee of 18 months. She also sought a stock grant to compensate her for the loss of value of the options she currently held. All of McKissick's proposals were rejected. Instead, she found out in December 2002 that she would only be getting a base salary raise from $315,000 to $345,000.

By early 2003, McKissick had purchased the previously discusses 80 acres of land through a short-term loan, and she had negotiated a construction loan for the construction of a building on the land.

On April 18, 2003, both Yuen and Leung were terminated for cause by Gemstar.

On June 6, 2003, McKissick signed a contract for the construction of the building on her ranch land. Under the contract, McKissick was required to pay $117,924 for the first phase of construction. At this time, McKissick also had a substantial mortgage on her home in Tulsa. Her total payments for her Tulsa home, the ranch land, and the construction loan for the building were approximately $12,000 per month. McKissick planned to live in her Tulsa home until the horse ranch was complete and then sell the Tulsa home and move to the ranch. McKissick would then obtain permanent financing for the horse ranch, as the financing she had at this point was in the form of short term 'bridge" loans.

By June 16, 2003, Gemstar had decided to terminate McKissick. Gemstar did not

5

immediately inform McKissick of the decision.

On July 11, 2003, McKissick wrote a memo to her superiors advising them that she believed an employee named Scott Reichardt was behaving inappropriately towards co-workers.

On July 28, 2003, McKissick met with her superior, Ian Aaron, who told her that she was going to be let go. McKissick told Aaron that "if the package was right, [she] would go happily."

On July 29, 2003, McKissick met with Gloria Dickey, Gemstar's head of human resources, in order to finalize a severance package. Dickey initially offered McKissick a severance payment of $345,000, representing one year's salary. McKissick in return asked for a six month consulting arrangement and twelve months of severance pay, fully-paid health insurance for her and her domestic partner for eighteen months, and compensation for her time should she be called to testify on Gemstar's behalf. McKissick also explained her financial situation to Dickey, and explained how her loss of employment might affect her ability to repay the short term loans she had secured for the building of the horse ranch. McKissick asked Dickey if Gemstar would keep her on the payroll as a "consultant" for a period of time, so that her lender would not call her loans based upon her unemployment. Dickey told McKissick that she would consult with Jeff Shell and get back to her.

Although it rejected McKissick's proposed consulting arrangement, Gemstar eventually agreed to make the $345,000 payment, plus an $80,000 payment which represented a prorated bonus for past performance and compensation for "cooperation in transition of duties." Gemstar also agreed to pay for eighteen months of health insurance, and to pay reasonable expenses should McKissick be asked to cooperate in any lawsuit against the company.

This severance package was presented to McKissick in the form of a Separation and Release Agreement ("the separation agreement"). The separation agreement was drafted by Gemstar and

6

provided that McKissick would receive "the following special benefits": (1) a lump sum payment of $345,000; (2) a lump sum payment of $80,000; and (3) continuation of McKissick's group health and dental insurance for a period of eighteen months at the company's expense. The separation agreement also provided that the company would pay "any reasonable expenses incurred by [McKissick] in connection with her providing cooperation" with the Company in connection with any claim or action brought for which McKissick had personal knowledge. In exchange, McKissick agreed to release claims she may have against the company:

> Employee (on behalf of herself and all her heirs, assigns, legal representatives, successors in interest, or any person claiming through her) hereby irrevocably and unconditionally releases and forever discharges the Company, its divisions, units, subsidiaries, parents, and all other affiliated entities, and each of their current and former employees, officers, directors, representatives, agents, shareholders, attorneys, accountants, partners, insurers, advisors, partnerships, assigns, successors, heirs, predecessors in interest, joint ventures, and affiliated persons (collectively "Releases Parties") from any and all liabilities, causes of actions, charges, complaints, suits, claims, obligations, costs, losses, damage, injuries, rights judgments, attorney's fees, expenses, bonds, bills, penalties, fines, liens, and all other legal responsibilities of any form or nature whatsoever, whether known or unknown, suspected or unsuspected, fixed or contingent, which she has or may have claim to by any reason of any and all matters from the beginning of time through the Effective Date (hereinafter collectively "Released Actions") including, but not limited to, those arising from or in connection with Employee's employment with the Company or the termination of such employment relationship[.]
> ...
> In short, Employee (on behalf of herself and the others described above) hereby knowingly and voluntarily releases any and all claims she has or may have against the Company and/or other Released Parties.

(Docket 267-14, at 16) (emphasis in original). On August 2, 2003, McKissick executed the separation agreement, and on August 8, 2003, Dickey signed the separation agreement on behalf of TV Guide Networks, Inc. McKissick and Dickey did not discuss any specific claims McKissick might have had against Gemstar prior to the execution of the separation agreement.

7

**B.      Procedural Background**

On March 30, 2004, McKissick sued Gemstar, Yuen, and Leung based upon certain alleged misrepresentations made by those Defendants during the merger of TV Guide, Inc. and Gemstar International Group Limited. According to McKissick, Defendants failed to disclose Gemstar's true financial condition and made false or misleading statements concerning Gemstar's revenues, thereby inducing McKissick to refrain from exercising certain stock options. As a result, when the stock's value subsequently plummeted, McKissick suffered significant financial losses. Accordingly, McKissick asserted claims against Defendants for violations of section 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder, as well as fraud and negligent misrepresentation. McKissick also asserted claims against Yuen and Leung individually for violations of section 20(a) of the Securities Exchange Act.

In its answer, Gemstar asserted a counterclaim against McKissick for breach of contract based upon the separation agreement McKissick executed upon her departure from TV Guide Networks. According to Gemstar, under the terms of the separation agreement, McKissick had released TV Guide Networks and any affiliated entities, including Gemstar, from all liability for claims arising prior to the effective date of the separation agreement and had covenanted not to sue Gemstar except to enforce the terms of the separation agreement. In exchange, McKissick had received $425,000 plus temporarily continued healthcare benefits. Gemstar alleged that by filing an action against Gemstar for claims arising prior to the effective date of the separation agreement, McKissick had breached the clear and unambiguous terms of the agreement.

On May 27, 2004, Gemstar filed its first motion for summary judgment, asserting that the separation agreement between McKissick and TV-Guide barred McKissick from pursuing her claims

against Gemstar. In her response, McKissick, while acknowledging that the separation agreement applied to Gemstar, nevertheless argued that the terms of the separation agreement did not bar McKissick from pursuing the particular claims raised in her complaint. In spite of McKissick's arguments, however, the Court found that McKissick had failed to raise any genuine issues of material fact and that, as a matter of law, the unambiguous language of the separation agreement barred McKissick from pursuing her claims against Gemstar. The Court therefore granted Gemstar's motion for summary judgment with regard to those claims (Docket No. 36).

Subsequently, on April 1, 2005, Gemstar filed a second motion for summary judgment regarding its counterclaim against McKissick, asserting that McKissick had breached the "No Actions" clause of the separation agreement, entitling Gemstar to damages for breach of contract. On January 27, 2006, the Court granted Gemstar's motion, awarding Gemstar "its attorney fees and costs incurred in defending [McKissick's] claims against it, and in obtaining summary judgment on its counterclaim" and "terminat[ing] [McKissick's] case against...Gemstar" (Docket No. 123, at 7).

On September 14, 2004, prior to the Court's order granting Gemstar's first motion for summary judgment, Yuen and Leung filed a joint motion to dismiss McKissick's claims against them. In their motion, Yuen and Leung noted that the terms of the separation agreement signed by McKissick also barred claims against current and former employees, officers, and directors of TV-Guide and its affiliates arising prior to the effective date of the release. Because Yuen and Leung were both former officers and directors of Gemstar, they argued that the clear and unambiguous terms of the separation agreement also barred McKissick's claims against them.

In her response, McKissick, in addition to disputing the various arguments raised by Yuen and Leung, requested additional time to conduct discovery as to the enforceability of the separation

9

agreement pursuant to Rule 56(f) of the Federal Rules of Civil Procedure. In particular, McKissick's accompanying Rule 56(f) declaration referenced previous filings in which McKissick had indicated her belief that the separation agreement had been executed under duress, thereby rendering it unenforceable.

On August 26, 2005, the Court entered an order granting in part and denying in part the motion by Yuen and Leung. The Court noted that unlike her response to Gemstar's first motion for summary judgment, in which McKissick had failed to request additional discovery or to fully develop her argument concerning the enforceability of the separation agreement, McKissick's response to the motion by Yuen and Leung had specifically requested an opportunity to conduct additional discovery as to the enforceability of the separation agreement. Finding that "the enforceability of the [separation agreement] is of utmost importance to the future of this cause of action" (Docket No. 94, at 6), the Court granted McKissick's request and denied the motion by Yuen and Leung insofar as it was premised on the separation agreement barring McKissick from asserting her claims against Yuen and Leung.

Following the Court's ruling, Yuen and Leung filed a motion for reconsideration, arguing that the Court's previous order granting McKissick's first motion for summary judgment established the law of the case with regard to the enforceability of the separation agreement and that any additional discovery would be insufficient to create a genuine issue of material fact precluding summary judgment. On December 20, 2005, however, the Court entered an order denying the motion for reconsideration, stating explicitly that it "ha[d] not ruled on the issue of duress in this case" (Docket No. 119, at 4). Instead, the Court clarified that "[a]s to Gemstar, the Court simply held that the [separation agreement] obviously and unambiguously barred suit against Gemstar." (*Id.*) In

10

contrast, the Court concluded that "the facts surrounding [the] individual roles [of Yuen and Leung]

in these events may be different from those involving [Gemstar]." (*Id.*)

On September 1, 2005, after the Court's denial of Yuen and Leung's motion to dismiss but

prior to the Court's ruling on their motion for reconsideration, the Court lifted the stay of discovery

that had been in place pending the ruling on the Motion to Dismiss (Docket No. 99). Discovery

continued until a September 11, 2007 status and scheduling conference. At that conference the

parties proposed that the Court bifurcate the case so that the issue of the enforceability of the

separation agreement could be disposed of prior to further discovery into the remaining causes of

action. At this point, the Court allowed the parties to define the issue of the "enforceability of the

[separation agreement]" by reference to the pleadings filed prior to September 19, 2007. The Court

gave the parties additional time to conduct discovery as to that issue—and that issue alone—with

the idea that cross motions for summary judgment would be filed finally determining whether Yuen

and Leung could enforce the separation agreement against McKissick. If so, McKissick's lawsuit

against Yuen and Leung could not proceed; if not, the case would continue. Those motions have

now been fully briefed and are before the Court.

In her motion, McKissick argues that: (1) Yuen and Leung are not released parties under the

separation agreement because they are not "specifically named", (2) the separation agreement is

latently ambiguous thus necessitating an examination of extrinsic evidence to explain the intent of

the parties, (3) the separation agreement was executed based on a mistake of law or fact, (4) the

separation agreement was executed under economic duress and coercion, (4) Yuen and Leung

should be estopped from relying on the separation agreement, and (5) Yuen and Leung are guilty

of fraud and deceit.

11

In their motion, Yuen and Leung argue that: (1) the law of the case establishes that the separation agreement applies to the claims in the case and that the separation agreement was supported by valuable consideration, (2) they are released parties under the separation agreement, (3) McKissick was not under economic duress when she executed the separation agreement, and (4) McKissick was not coerced into executing the separation agreement.

## DISCUSSION

### A.    Summary Judgment Standards

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In making the summary judgment determination, the Court examines the factual record and draws reasonable inferences therefrom in the light most favorable to the non-moving party. *Simms v. Oklahoma*, 165 F.3d 1321, 1326 (10th Cir. 1999). The presence of a genuine issue of material fact defeats the motion. An issue is "genuine" if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if proof thereof might affect the outcome of the lawsuit as assessed from the controlling substantive law. *Id.* at 249.

### B.    The Scope of the Release

McKissick first argues that the separation agreement did not release Defendants Luen and Yeung from liability because it did not "specifically name" them as released parties, as required by Oklahoma law:

> H.    When a release, covenant not to sue, or a similar agreement is given in good faith to one of two or more persons liable in tort for the same injury or the

same wrongful death:

> 1.      It does not discharge any other tort-feasor from liability for the injury or wrongful death unless the other tort-feasor is <u>specifically named</u>; but it reduces the claim against others to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is greater[.]

Okla. Stat. tit., 12 § 832(H)(1) (emphasis added).

In response, Defendants argue that: (1) the instant separation agreement is not the type of release contemplated by § 832(H)(1), and (2) the separation agreement adequately identifies them as released parties. The Court first addresses whether the separation agreement adequately identifies Yuen and Leung as released parties.[4]

The relevant portion of the separation agreement states:

> Employee (on behalf of herself and all her heirs, assigns, legal representatives, successors in interest, or any person claiming through her) hereby irrevocably and unconditionally releases and forever discharges the Company, its divisions, units, subsidiaries, parents, and all other affiliated entities, and each of their current and former employees, <u>officers, directors</u>, representatives, agents, shareholders, attorneys, accountants, partners, insurers, advisors, partnerships, assigns, successors, heirs, predecessors in interest, joint ventures, and affiliated persons (collectively "Released Parties") from any and all liabilities[.]

(Docket 267-14, at 16) (emphasis added). It is undisputed that during the time period they were affiliated with Gemstar, Yuen and Leung were "officers" or "directors" of Gemstar. McKissick argues, however, that the separation agreement's release of "officers [and] directors" is insufficient and that Oklahoma law requires that the separation agreement specify that "Henry C. Yuen" and "Elsie M. Leung" are released parties. The Court disagrees.

In *Moss v. City of Oklahoma City,* 897 P.2d 280 (Okla. 1995), the Oklahoma Supreme Court

---

[4]Finding that it does, the Court does not address Defendants' contention that § 832(H)(1) does not apply to the separation agreement in question.

examined a previous version of § 832(H)(1) which read, in pertinent part:

> H.     When a release, covenant not to sue, or a similar agreement is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death:
>
> > 1.     It does not discharge any other tort-feasor from liability for the injury or wrongful death <u>unless its terms so provide</u>; but it reduces the claim against others to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is greater[.]

Okla. Stat. tit., 12 § 832(H)(1) (emphasis added). In deciding *Moss*, the Oklahoma Supreme Court sought to clarify the amount of specificity required by this statute. The court concluded that the statute embodied the "specific identity" rule, which requires that releases of liability "expressly designate by name or otherwise specifically identify" those potential tortfeasors that are released. *Moss*, 897 P.2d at 288. The Oklahoma court therefore adopted the following rule: "for a general release...to discharge from liability potential tortfeasors not parties to the release, the language contained in the release must expressly designate by name or otherwise specifically identify such other potential tortfeasors." *Id.*

The same day the Oklahoma Supreme Court decided *Moss*, the Oklahoma State Legislature amended § 832(H)(1) to its current form. The amendment appeared to be an attempt by the Legislature to confirm that § 832(H)(1) indeed embodies the "specific identity" rule. *See* Erika Blomquist, *Torts: Moss v. City of Oklahoma City Marks the Demise of the General Tort Liability Release,* 49 Okla. L. Rev. 553, 565 ("Plainly, this amendment to section 832 reflects an adherence to the specific identity rule espoused in the *Moss* decision"). Indeed, after the amendment, the *Moss* Appellees' quickly filed a petition for rehearing arguing that if the amendment constituted a legislative act taken to substantively change the original statute, then the *Moss* court had wrongly

14

interpreted the statute.[5] *Id.* at 567. If, however, the legislature's purpose was to simply clarify the original statute, the *Moss* court had correctly interpreted the statute as embodying the specific identity rule. *Id.* The Oklahoma Supreme Court quickly denied the petition for rehearing, indicating that it viewed the legislative amendment as simply clarifying that the specific identity rule applied.

Additionally, shortly after the statute had been amended, the Oklahoma Supreme Court was presented with a release similar to that at issue in *Moss* in *Cotner v. Cessna Aircraft Co.,* 903 P.2d 878 (Okla. 1995). In that case, the Oklahoma Supreme Court reiterated that the relevant test was whether the release "named...or otherwise specifically identified" the purportedly released party. *See also Carmichael v. Beller,* 914 P.2d 1051, 1056-57 (Okla. 1996); *Shadden v. Valley View Hospital,* 915 P.2d 364, 369 (Okla. 1996).   Therefore, it appears as though the relevant standard in determining whether a release satisfies the amended § 832(H)(1) is whether it "names *or otherwise specifically identifies*" the party claiming release.

Despite that caselaw to the contrary, McKissick argues that *Moss* and the amended § 832(H)(1) are not in conflict, because "'specifically identifying' is equivalent to naming." Essentially, McKissick argues that even *Moss* requires a release to name all released parties. The Court disagrees. If "specifically identify" and "name" are indeed synonymous, the *Moss* holding is at least partially superfluous. Indeed, under McKissick's interpretation of the *Moss* holding, when the *Moss* court said a release must "name or otherwise specifically identify" a released party, the court actually meant the release must "name *or name*" a released party.  That, of course, cannot be the case. By holding that a release must "name *or otherwise specifically identify*" the *Moss* court indicated that "otherwise specifically identifying" a party is something different than "naming"

_____

[5]That is, if the newly amended language was meant to embody the specific identity rule, the prior language must have embodied some other rule.

15

them. And by continuing to apply the *Moss* specific identity rule even after the amendment to §

832(H)(1), the Oklahoma Supreme Court has clearly indicated that the statutory "specifically

nam[e]" standard is the functional equivalent of the *Moss* "name or otherwise specifically identify"

standard. Thus, the Court agrees with McKissick that *Moss* and the amended § 832(H)(1) can co-

exist, but not because "specifically identify" is synonymous with "name", instead because the

Oklahoma Supreme Court has indicated that "specifically nam[e]" is synonymous with "name *or*

*otherwise specifically identify*"  Therefore, this Court, like the Oklahoma Supreme Court, continues

to apply the *Moss* rule.

Here, the separation agreement does not name Yuen and Leung, but it does otherwise

specifically identify them.[6] Indeed, by identifying Gemstar's "officers" and "directors"as release

parties, the separation agreement identifies a unique and narrow category of people and makes

manifestly clear whom it is referencing.

Therefore, it being undisputed that McKissick's claims against Yuen and Leung arise out of

actions taken by Yuen and Leung when they were "officers" and "directors" of Gemstar, the Court

determines that the separation agreement specifically identifies Yuen and Leung as released parties.


C.      **Intent of the Parties**

McKissick next argues that neither she nor Gemstar intended the separation agreement to

---

[6]McKissick argues that it does not, claiming that "[t]he broad terms in the SAR such as former officers, directors, employees, and stockholders, etc. do not specifically identify a person even under the cases decided under the old version of § 832." However, the Oklahoma Supreme Court first adopted the "specific identity" rule in the *Moss* case, and as the Court has explained, § 832(H)(1) was amended the very day the *Moss* opinion was released. Therefore, *Moss* would seemingly be the *only* case applying the specific identity rule prior to the amendment. And the release in *Moss*  involved broad, boilerplate language that purported to release the entire world, and not the more specific "officers" and "directors" language involved her, as McKissick suggests. The Court is therefore unclear as to what "cases" McKissick references, and McKissick does not support her argument with a citation that might point the Court in the direction of the caselaw to which she refers.

release the claims she now brings against Yuen and Leung. Therefore, although the separation agreement plainly purports to release "any and all claims," McKissick argues that when extrinsic evidence is examined, it becomes obvious the separation agreement contains a "latent ambiguity" and actually only releases "employment related claims." Specifically, McKissick argues that the consideration she received in exchange for executing the separation agreement was not valuable enough to evidence an intent to release the fraud claims she now brings—which she estimates are worth "at least $7,000,000."

Under Oklahoma law, a latent ambiguity is a "defect not appearing on the face of the instrument being considered and arises when some extrinsic fact creates a necessity for interpretation or a choice between two or more possible meanings**." Cox v. Kaiser-Francis Oil Co.,** 152 P.3d 274, 278 (Okla. Ct. App. 2006). McKissick points to *Vitkus v. Beatrice*, 11 F.3d 1535 (10th Cir. 1993) in support of her contention that such a latent ambiguity exists here.[7]

In *Vitkus,* the plaintiff Vitkus sued his former employer Beatrice claiming that Beatrice failed to indemnify Vitkus when he was sued by the Federal Deposit Insurance Corporation for claims arising out of the failure of a savings and loan bank that Vitkus had served as a director of at Beatrice's request. Beatrice argued that although it may have been obligated to indemnify Vitkus when he was an employee, a termination letter Vitkus signed when he left Beatrice released Beatrice of any obligation to indemnify him. The district court agreed with Beatrice that the termination letter was unambiguous and released Beatrice from any obligation to indemnify Vitkus. The district court, thus granted summary judgment in Beatrice's favor. On appeal, Vitkus argued that the termination

---

[7]McKissick also points to *Tulsa City Lines, Inc. v. Mains,* 107 F.2d 377 (10th Cir. 1939)(involving a mutual mistake of fact that warranted rescission of a release agreement) and *Safety Cab Co. v. Fair,* 74 P.2d 607 (Okla. 1937)(holding that an agreement which only released two defendants did not release remaining three defendants). Neither case guides the Court's latent ambiguity analysis. Thus, no discussion of either case is warranted.

letter contained a latent ambiguity because a previous severance agreement Vitkus had executed

contradicted the terms of the otherwise unambiguous termination letter. The Tenth Circuit agreed,

and found that the termination letter contained a latent ambiguity when read together with the

previous severance agreement. Under that previous severance agreement:

> Vitkus had the right to retain benefits that he received from Beatrice that were not
> provided in conjunction with his termination. The circumstances suggest that when
> Vitkus received the Termination Letter, which provided benefits nearly identical to
> those to which he was entitled under the Severance Agreement, he could have been
> justified in believing that the Termination Letter was simply implementing the
> Severance Agreement and that it, like the Severance Agreement, left unaffected
> benefits other than those in connection with his termination. In fact, the Termination
> Letter states it is "to confirm the provisions of [Vitkus'] separation from Beatrice."
> In the context of the Severance Agreement and the Termination Letter (to which the
> Release was attached), we believe that language releasing Beatrice's financial
> obligations in connection with Vitkus' employment creates a latent ambiguity as to
> whether it was intended to include Beatrice's financial obligations in relation to
> Vitkus' service on the [savings and loan bank's] board, such as the obligation to
> provide insurance and indemnity.

*Id.* at 1544 (citations omitted). Finding this latent ambiguity, the Tenth Circuit reversed the district

court:

> Because the Release is ambiguous, the determination of what the parties intended to
> be included within its scope is a fact question for the jury. We believe that the
> evidence detailed above is sufficient to raise a genuine issue of material fact as to
> whether the parties intended the Release to discharge Beatrice's insurance and
> indemnity obligations relating to Vitkus' service on the Silverado board.

*Id.*

The instant case is distinguishable. The extrinsic evidence the *Vitkus* court relied on was a

separate and inconsistent prior agreement. No such previous agreement exists here. Instead,

McKissick relies on the amount of consideration paid to her—something that can hardly be

described as extrinsic to the agreement. Indeed, the amount of consideration paid to McKissick is

plainly set out in the separation agreement itself, and the separation agreement unambiguously states

18

that in exchange for that consideration, McKissick was "knowingly and voluntarily releas[ing] any and all claims she has or may have against the Company and/or other Released Parties" (Docket 267-14, at 16) (emphasis in original).

The only evidence that McKissick points to that is truly extrinsic to the separation agreement is her contention that her fraud claim is worth "at least $7,000,000." McKissick's argument is that the nearly half-a-million dollars consideration she received is inadequate consideration in light of the value she places on her fraud claim. McKissick confuses, however, the value of her *right to sue* with the value of her claim *if successfully prosecuted*. While the Court agrees with McKissick that the claims she now brings may be worth more than $7,000,000 if successfully prosecuted, the relevant question is whether there is enough of a disparity in the value of the consideration McKissick received and the value of her right to bring her fraud claim so as to indicate the parties did not intend to release the fraud claim. While McKissick attaches a monetary value of $7,000,000 or more to her successfully prosecuted claim, a monetary value is not so easily assigned to her right to bring that claim—and the Court does not attempt to assign such a value here. The Court simply recognizes that the litigation process is costly and fraught with risk and uncertainty. Because of this risk and uncertainty, plaintiffs—after balancing the risks and uncertainty with the potential rewards that might be reaped at the conclusion of a successful trial—routinely settle cases for less money than what they might receive from a jury upon successful prosecution of the case. This distinction between the worth of a litigant's *right to sue* and a litigant's *successfully prosecuted claim* is nothing more than the pragmatic recognition that, indeed, "a bird in the hand, is [sometimes] worth two in the bush." Thus, the Court frames the issue differently than McKissick, and looks instead at whether the consideration McKissick received was adequate consideration for her relinquishment of her right

19

to bring a claim that may be worth $7,000,000 or more if successfully prosecuted.

Here, the face of the separation agreement clearly indicates that the intent of the parties was for McKissick to release "any and all claims" in exchange for nearly half-a-million dollars worth of consideration. The Court finds that the consideration McKissick received was adequate, and nothing about the amount of consideration she received gives rise to any latent ambiguity that would give this Court reason to question the unambiguous language contained within the separation agreement. Thus, even considering the extrinsic evidence McKissick offers, the Court does not find the separation agreement to be ambiguous.

Therefore, the Court finds that the separation agreement is unambiguous and releases the claims McKissick now brings.

**D.      Mistake of Fact or Law**

McKissick next argues that the separation agreement was executed under a mistake of fact or law, an argument closely related to her "latent ambiguity" argument.

Oklahoma law provides that a written agreement may be reformed when through "fraud, mistake, or accident" the agreement does not express the real intentions of the parties. Okla. Stat. tit., 15 § 156. However, only a mutual mistake of fact or law, or a unilateral mistake of fact of law plus inequitable conduct, can justify reformation of a contract; one party's mistake is not sufficient. *Thompson v. Estate of Coffield*, 894 P.2d 1065, 1068 (Okla. 1995); *see Fessler v. Fariss*, 304 P.2d 332 (Okla. 1956). Additionally, to justify reformation or rescission, the evidence of mistake must be "clear and unequivocal." *Thompson*, 894 P.2d at 1068.

Here, while McKissick argues that her intent in executing the separation agreement was to release only employment related claims, McKissick has not presented the requisite "clear and

20

unequivocal" evidence that Gemstar intended the same. McKissick argues that the amount of consideration paid evidences an intent on the part of Gemstar to only release employment related claims. The Court, however, has already rejected that contention, and therefore finds that McKissick has failed to establish the existence of a mutual mistake.

McKissick must therefore establish that Gemstar engaged in some sort of inequitable conduct that would excuse her unilateral mistake. McKissick's argument on this point is limited to a footnote contained within her reply brief (Docket No. 287, at 7 n. 7). McKissick argues that Gemstar acted inequitably because it intended Yuen and Leung to be released parties but did not "discus[s]" or "provid[e] [her] compensation" for releasing those two. As for the failure to "discuss" the release of Yuen and Leung, the Court notes that the release plainly releases Gemstar's "officers" and "directors." Additionally, in signing the separation agreement, McKissick acknowledged that she had "carefully read" the agreement and that she "fully underst[ood]" its provisions. (Docket 267-14, at 18). McKissick further acknowledged that she had been given "ample" opportunity to "thoroughly discuss all aspects of [the] agreement with her attorneys." (*Id.*). Therefore, McKissick cannot claim that Gemstar in any way attempted to hide from her the fact that the separation agreement released its "officers" and "directors" from any liability. The separation agreement was plainly intended to be a broad release of claims, and there is nothing inequitable in Gemstar's failure to specifically discuss with her each and every party released by the separation agreement.

McKissick's second contention is that Gemstar acted inequitably in executing the separation agreement because it did not "compensat[e]" her for the claims she now brings. Having previously found that McKissick *was* provided valuable and adequate consideration for her release of *all* claims she had against the released parties, the Court of course does not, and cannot, find that Gemstar

acted inequitably in this regard.

Therefore, the Court finds that the separation agreement was not the product of any mistake of law or fact and cannot be set aside or reformed on those grounds.

### E.       Economic Duress

McKissick next argues that she executed the separation agreement under economic duress, and should be allowed to avoid the agreement.

Under Oklahoma law, the doctrine of economic duress allows a party to avoid a contract it has entered if a "wrongful act [of the other party was] sufficiently coercive to cause a reasonably prudent person faced with no reasonable alternative to succumb to the perpetrator's pressure." *Strickland Tower Maintenance, Inc. v. AT&T Communications, Inc.,* 128 F.3d 1422, 1426 (10th Cir. 1997) (quoting *Centric Corp. v. Morrison-Knudsen Co.,* 731 P.2d 411, 416 (Okla. 1986)). The doctrine is not designed to prevent "hard bargaining", which is "acceptable, even desirable, in our economic system."*Centric Corp.,* 731 P.2d at 413-414. Instead, the doctrine seeks only to impose "certain minimal standards of business ethics in the market place" and comes into play only to correct "aberrational abuse[s]" of business norms.  *Id.* at 413-414.

A party seeking to avoid a contract based on economic duress must prove that: (1) the contract was the result of a wrongful or unlawful act, initiated and committed with knowledge of its impact and for the purpose of coercion, (2) the coerced party had no reasonable alternative to the contract, and 3) the coercion caused detriment to the coerced party. *Id.* at 417.

As the rule suggests, a party seeking to prove economic duress must first show that the defendant committed a wrongful act, and secondly—and perhaps more importantly—must show a causal connection between the bad act and the agreement at issue. *Strickland,* 128 F.3d at 142*; see*

22

*also Centric*, 731 P.2d at 417 (The wrongful act must have been committed "for the purpose of" securing coercion over the other party). Therefore, McKissick must show that "the defendant's bad act, not something else, must have forced the plaintiff to sign the [agreement]." *Id.* It is not sufficient for McKissick to merely show that her financial instability put her at a disadvantage, as "a litigant cannot...make out a claim of economic duress by alleging merely that the opposing party took advantage of her weak negotiating position[.]"   *Id.*

Here, McKissick has failed to provide legally sufficient evidence of economic duress. Indeed, an examination of the cases relied upon by McKissick in support of her position highlights the inapplicability of the *Centric* doctrine of economic duress to the facts of this case. In *Totem Marine Tug & Barge, Inc. v. Alyeska Pipeline Service Co.*, the seminal economic duress case and a case relied upon by the *Centric* court, a pipeline company (Alyseka) contracted with a tug and barge company (Totem) to transport pipeline materials from Texas to Alaska. 584 P.2d 15 (Alaska 1978). From the outset, Totem encountered unanticipated problems and delays. When Totem's tugs and barge finally made it to California, Alyeska had the barge unloaded and unilaterally terminated the contract. Totem submitted around $300,000 worth of invoices for services rendered and informed Alyeska that without immediate payment, Totem would be forced into bankruptcy. Alyeska in turn offered Totem $97,500 in full settlement, which Totem accepted. As part of the settlement Totem also signed an agreement releasing Alyeska from all claims under the contract. A few months later, Totem sued Alyeska for the balance due under the contract. After the trial court granted summary judgment for Alyeska based on the settlement agreement, the Supreme Court of Alaksa reversed, noting that Alyeska had "deliberately withheld payment of an acknowledged debt, knowing that Totem had no choice but to accept an inadequate sum in settlement of that debt."*Id.*

23

at 24. The court concluded that Alyeska's actions "constitute[d] the type of wrongful conduct and lack of alternatives that would render the release voidable by Totem on the grounds of economic duress." *Id.*

Similarly, in *Rich & Whillock, Inc. v. Ashton Development, Inc.,* another case relied upon by the *Centric* court, a subcontractor contracted with a contractor for grading and excavation services. 157 Cal.App.3d 1154 (Cal. Ct. App. 1984). The parties agreed upon a contract price of $112,990, which expressly excluded any blasting work which might become necessary. Soon after beginning work, the subcontractor encountered rock which would have to be blasted. The subcontractor met with the contractor to discuss the problem. After agreeing that the blasting would be unpredictable, and the cost difficult to estimate, the contractor told the subcontractor to proceed with the blasting and to bill the contractor for the additional work. The subcontractor proceeded with the work and submitted periodic invoices to the contractor, which the contractor paid. After receiving a total of $190,363.50 for the work, the subcontractor submitted a final invoice for $72,286.45. The contractor refused to pay, telling the subcontractor that the contractor was out of money and could not pay. After the subcontractor informed the contractor that it faced imminent bankruptcy if not paid the final $72,286.45, the contractor offered the subcontractor a "take it or leave it" sum of $50,000, and told the subcontractor that if it did not accept the payment, it would have to sue the contractor for any payment. The subcontractor reluctantly accepted the $50,000 and signed a release form. The subcontractor then sued for the unpaid balance. The trial court sided with the subcontractor, holding that the release was executed under economic duress. The California Court of Appeals affirmed, finding that the contractor acted in bad faith when it refused to pay an acknowledged debt knowing that the subcontractor was overextended and facing bankruptcy.

As *Totem* and *Rich & Whillock* demonstrate, and as *Centric* recognized, there must be a causal connection between the wrongful act and the agreement at issue. Indeed, in both *Totem* and *Rich & Whillock*, the defendants had at least partially caused the plaintiffs' economic duress by entering into a contract for services, allowing the plaintiffs to place themselves in a precarious financial situation as they performed the contract, and then refusing to pay for that performance, knowing their refusal to pay would place the plaintiffs in dire financial straits. It was only then that the *Totem* and *Rich & Whillock* defendants made "lowball" offers in settlement, knowing that the plaintiffs had no alternative but to accept. The wrongful act in each case was the defendants' bad faith refusal to pay an acknowledged debt knowing that the plaintiffs would have to accept a lesser amount to avoid bankruptcy.

The instant case, of course does not involve such a refusal to pay an acknowledged debt. To the contrary, the record is clear that McKissick had no written employment agreement with Gemstar, and there is no allegation that Gemstar "owed" McKissick anything when it terminated her. The record does indicate that Gemstar told McKissick she was being terminated, and then offered her the opportunity to agree to a severance package in exchange for a release of any claims she may have against Gemstar—a situation vastly more benign than the situation in *Totem* and *Rich & Whillock*.

McKissick nonethless argues that the undisputed factual record establishes the requisite "wrongful conduct" on the part of Gemstar:

> Plaintiff's Statements of Undisputed Facts establish the following facts which satisfy the wrongful act element for duress.
>
> 1.   Plaintiff made substantial loans for the purchase of land and construction of a horse ranch in reliance on repeated assurances by Gemstar that she and her operation would remain in Tulsa, Oklahoma.

25

2.     Gemstar was aware that Plaintiff was incurring significant on-going debt for land and construction of her ranch, and knew that she was relying on the assurances described in paragraph 1 above and assurances that she was well regarded in the company, and that her job was secure.

3.     Gemstar also knew that because of Plaintiff's substantial loans, if she lost her job before completion of construction (which would permit permanent financing), she would likely lose all the property (both the ranch and her then current home) and possibly face bankruptcy.

4.     The assurances described above were made to Plaintiff at least through June 6, 2003 when Plaintiff relied on such assurances and secured additional temporary financing for the construction of her ranch building.

5.     On July 11, 2003 Plaintiff wrote a confidential memo to Ian Aaron, her then recently hired immediate supervisor and to the corporate HR department, among others, advising them of intimidating, abusive, and inappropriate conduct directed toward employees, especially women, by a young male executive of the company, identified as Scott Reichardt (not in Plaintiff's department), and reminding them that the conduct had been ongoing for a long time. From July 11 through July 17 McKissick tried to get corporate management to focus on the problem and meet to discuss a solution.

6.     On July 28, 2003, 11 days later, she was instructed to meet Ian Aaron for breakfast in Tulsa where he advised her she was being let go. Ian said he barely knew her and it appeared she was doing a good job and that he felt like "Gumby" having to come and do this. When asked, he indicated to Plaintiff that it was Jeff Shell, the then CEO of the company, who wanted her fired. Among the things Ian Aaron asked her at the breakfast meeting was if she thought the company should relocate the offending executive to another city to decrease chances of his abusive behavior. When Plaintiff told him relocation would only allow him to continue his behavior in another city, he ended the conversation quickly saying the man's behavior wasn't the company's top priority right now, anyways.

7.     At the time of the Agreement, both Gemstar and Plaintiff were aware of the potential claims she had or would have against Gemstar for gender discrimination, age discrimination, and wrongful, retaliatory termination.

8.     Plaintiff was given less than a week to vacate her office and was told that the terms of the Agreement were not negotiable.

9.     Given the totality of these circumstances, Plaintiff reasonably believed that she had no practical choice other than to accept the Agreement.

10.  Gemstar terminated McKissick's employment for improper and unjustifiable reasons including, but not limited to, (a) that it sought to cover up the complaints against Scott Reichardt and to avoid disciplining him, and (b) that it sought to place McKissick in economic distress to gain a superior bargaining position so that she would be forced to sign the SAR.

(Docket No. 277, at 33-35). However, many, if not most, of these claims are not supported by even McKissick's own "statement of undisputed facts."

First, McKissick's statement of undisputed facts establishes that she sought and at some point received assurances from Jeff Shell that he did not plan on moving Gemstar's Tulsa operations, and her statement establishes that at least someone at Gemstar knew McKissick was building a horse ranch. McKissick's statement of facts does not establish, nor even allege, that she took out the loans for that ranch "in reliance" on Jeff Shell's assurances, as McKissick alleges in paragraph one above.

Similarly, McKissick's claim in paragraph two that Gemstar "knew that she was relying on the assurances" is unsupported by McKissick's statement of facts, which makes no such factual allegation.

McKissick's claim in paragraph three is also not supported by her own statement of facts. McKissick's statement of facts establishes that Gemstar became aware of her financial vulnerability at a July 29, 2003 meeting with Gloria Dickey. That meeting occurred after McKissick's July 28, 2003 notice of termination, and was a meeting to discuss details of a potential severance package.[8]

_____

[8] Paragraph 53 of McKissick's statement of facts does claim that McKissick (prior to her termination) "advised Jeff Shell of her financial vulnerability." McKissick cites to pages 106:19-107:4 of her deposition transcript in support of this claim. That deposition testimony simply does not support her statement of fact:

Q.  At this point? Did you take any other steps to test the market?

A.  No, because I was very much embedded in this real estate thing, the horse ranch. I had really — I was in it, and committed to it, and I needed to be able to stay here, which is why I kept checking with Jeff and with Anthea and with Henry to make sure that I was

None of McKissick's statements of fact support her assertion that Gemstar knew that firing her would place her in a financially vulnerable state. Her statements establish only that Gemstar became aware of how financially overextended McKissick was *after* her termination and during discussions regarding a severance package.

Most puzzling is McKissick's claim that she was fired in retaliation for her reporting the misbehavior of Scott Reichardt. McKissick's own statement of undisputed facts acknowledges that Gemstar had made the decision to fire her "at least by June 16, 2003." That very same statement of undisputed facts also acknowledges that McKissick informed Ian Aaron—the supervisor who terminated her—of the employee's behavior via a confidential memo sent July 11, 2003, and there is no evidence that McKissick made any previous report to Aaron regarding Reichardt.[9] Thus, based on a time-line of the events described by McKissick in her statement of facts, her termination could not have been motivated by her report to Aaron.[10] Therefore, McKissick's reliance on this claim as evidence of "wrongful conduct" on the part of Gemstar is misplaced.

In sum, the majority of "wrongful acts" which McKissick points to and claims are established by her statement of facts, are not. At best, McKissick's statement of facts establishes that Gemstar at some point assured her that it had no plans to shut down its Tulsa operation, and it

---

okay.

Because to do this in Tulsa is a risky thing, it is a — it is not New York. You don't go down the street and get another job.

(Docket 267-3, at 106:19-107:4).

[9]McKissick does claim that she had complained of Reichardt's behavior prior to July 11, 2003, but does not specify to whom those complaints were directed.

[10]McKissick does claim that she had complained to *someone* about the employees behavior prior to July 11, 2003, but there is no indication that McKissick had ever spoken to Ian Aaron about the employee prior to the July 11, 2003 memo.

28

establishes that someone at Gemstar knew that she was building a horse ranch. It does not establish that Gemstar knew that McKissick's building of the ranch was placing her in a financially precarious position. It does not establish that Gemstar knew McKissick was building her ranch in reliance on its assurances that the Tulsa operation was safe. Nor does it establish that Gemstar "terminated McKissick's employment...to cover up the complaints against Scott Reichardt and to avoid disciplining him."

Regardless, even were the Court to accept all ten of these alleged wrongful acts as true, McKissick has failed to present any evidence that Gemstar's actions in assuring her the Tulsa operations were "safe" were committed with the knowledge that those assurances would cause McKissick to place herself in a financially vulnerable position; nor has she presented any evidence that those assurance were made for the purpose of securing coercion over her. *See Centric*, 731 P.2d at 417. Thus, even were the Court to believe that Gemstar intentionally misled McKissick about the continued viability of her employment in Tulsa, McKissick has failed to establish that those misrepresentations were made in order to place her in a financially precarious position and render her vulnerable to economic coercion. While McKissick's statement of facts establishes that Gemstar—after becoming aware of her vulnerability—perhaps drove a "hard bargain," that type of bargaining does not violate "minimal standards of business ethics," and thus does not give rise to an economic duress defense.

Therefore, the Court rejects economic duress as a defense to the enforceability of the separation agreement.

F.     **Estoppel**

McKissick next argues that Yuen and Leung should be "estoped by their actions" from

asserting the separation agreement as a bar to her claims. McKissick argues that Yuen and Leung "are responsible for the loss of McKissick's [stock] options and played a significant role in inducing McKissick to maintain her employment at Gemstar with promises that she could stay in Tulsa and perform her duties." McKissick argues that these actions are "wrongful" and "form the basis for an estoppel prohibiting [Yuen and Leung] from profiting from their wrongdoing."

Under Oklahoma law, equitable estoppel "holds a person to a representation made, or a position assumed, where otherwise inequitable consequences would result to another, who has in good faith, relied upon that representation or position." *Merritt v. Merritt,* 73 P.3d 878, 883 (Okla. 2003)(citations omitted). "Equitable estoppel is employed to prevent one party from taking a legal position inconsistent with an earlier action that places the other party at a disadvantage." *Id.* (citing *First State Bank v. Diamond Plastics Corp.,* 73 P.3d 878 (Okla. 2003).

Here, McKissick makes the curious argument that Yuen and Leung should be estopped from asserting the separation agreement as a defense to her claims because of the allegedly fraudulent actions taken by Yuen and Leung which underlie McKissick's fraud claim. However, the Court's equitable powers do not reach the circumstances described by McKissick. If the Court had such power, every release or settlement agreement would be subject to attack on the grounds that the very conduct that prompted the need for the release or settlement bars the enforcement of the release or settlement. Instead, for equitable estoppel to apply, McKissick must point to some earlier position taken by Yuen and Leung that is inconsistent with the position they now take—that is, some earlier position that is inconsistent with their current position that the separation agreement bars the instant suit. McKissick has failed to do so, and as a result the Court cannot exercise its equitable powers to declare the separation agreement unenforceable.

30

The Court therefore rejects McKissick's equitable estoppel defense to the enforcement of the separation agreement.

## G.     Fraud and Deceit

Finally, McKissick argues that Yuen and Leung engaged in fraud and deceit, which she argues should invalidate the separation agreement.

Oklahoma law provides that a party is guilty of fraud and deceit "where, with intent to induce another to enter into a contract, he makes a positive assertion, which is material, in a manner not warranted by his information, or where he is not shown to have reasonable grounds for believing it true, where the assertion so made is not true, even though believed by the party making it." *Farrar v. Chitwood,* 282 P.2d 729, 731 (Okla. 1955).[11]

Here, the fraudulent and deceitful conduct complained of by McKissick occurred in January 2002, more than a year prior to her termination and subsequent execution of the separation agreement. McKissick has presented no evidence that those allegedly fraudulent and deceitful acts were made with the intent to induce her to execute the separation agreement. In the absence of such evidence, McKissick cannot claim that Yuen and Leung deceived her in regard to the execution of the separation agreement.

The Court therefore rejects McKissick's fraud and deceit defense to the enforceability of the separation agreement.

## CONCLUSION

For the reasons set forth above, Plaintiff Pamela L. McKissick's Motion for Summary

---

[11]In her motion, McKissick cites to the Oklahoma statute defining "deceit" for purposes of a tort claim for damages arising from a deceit. See Okla. Stat. tit., 76 §§ 2 and 3. Here, however, McKissick raises the issue of fraud and deceit as a defense to the enforceability of the separation agreement, and not as a tort claim for damages.

Judgment (Docket No. 277) is DENIED, and Defendants Henry C. Yuen and Elsie M. Leung's Motion for Summary Judgment (Docket No. 266) is GRANTED.

James H. Payne
United States District Judge
Northern District of Oklahoma